# United States Court of Appeals

### For the Eighth Circuit

_____

No. 13-2618

_____

Brice S. Cody

*Plaintiff - Appellant*

v.

Prairie Ethanol, LLC

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Sioux Falls

_____

Submitted: June 12, 2014
Filed: August 15, 2014

_____

Before LOKEN, BRIGHT, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Brice S. Cody appeals the district court's[1] grant of summary judgment in favor of Prairie Ethanol, LLC ("Prairie Ethanol") on his claim of disability discrimination

_____

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12201, *et seq.* For the reasons described below, we affirm.

## I. Background

Prairie Ethanol manufactures ethanol. In November 2006, Prairie Ethanol hired Cody as a plant operator in its Mitchell, South Dakota plant. Plant operators manage the plant's processes and computer control system. They make adjustments, often quickly, to prevent the plant machinery from "swinging." Failure to prevent swinging can cause an operator to "lose the plant." Swings and losses of the plant cause the plant to slow down or go offline, which can result in a significant decrease in production. Thus, it is critical to operate the plant without swings and without it being lost.

On June 11, 2007, Cody injured himself at work when he hit his hardhat on a crossbeam of a metal storage rack, causing an injury to his neck. As a result, a doctor recommended work restrictions, including that Cody not lift more than ten pounds, only perform ground work, not perform "over the shoulder work," and work with minimal bending or twisting of his neck and back. The restrictions changed over time but still generally involved restrictions on his ability to lift, bend, and perform over-the-shoulder work. It is undisputed that Prairie Ethanol accommodated Cody until August 2008. Cody alleges that, at this point, Becky Pitz, the plant's technical manager, told him that Prairie Ethanol could not allow him to remain on light duty forever and asked him almost every day when he would be able to return to full duty.

Meanwhile, on August 22, 2007, Prairie Ethanol promoted Cody to lead operator. Lead operators communicate the needs and concerns of the plant operators to management. They also must strive for maximum efficiency in plant operations and work with all departments to correct process problems. In November 2007, Rick Schauer, the operations manager, had a discussion with Cody about his operation of

the plant because Cody had made unnecessary changes to the "recycle screw," causing the plant machinery to swing wildly. Around this same time, Schauer and Pitz told Cody that he could not take his prescription narcotic pain medication while at work even if it was prescribed by his physician. Cody's performance as lead operator was evaluated in December 2007. The performance assessment reported that he was meeting Prairie Ethanol's expectations. However, it stated that he needed to improve his communications skills, use more tact when communicating with subordinates, peers, and management, and continue to develop interpersonal relationship skills. Shortly thereafter, Cody had neck surgery and took a leave of absence. He returned to work in March 2008. In August 2008, Schauer again spoke to Cody about his "style of running the plant" and about certain inappropriate comments that Cody had written in the plant's logbook. Schauer told Cody that the conversation was a verbal warning.

On September 10, 2008, Cody was placed on a performance improvement plan ("PIP"), which he signed. The plan listed workplace etiquette and plant operations as required performance-improvement areas and provided that Cody needed to run the plant consistently, lead by example, and show respect to fellow employees. The documentation attached to the PIP noted that Cody previously had been warned verbally about his overly aggressive manner of operating the plant. As a result of the PIP, Cody was demoted back to the position of plant operator. In October, the doctor reduced Cody's work restrictions, allowing him to perform medium-duty work. Cody completed the PIP on October 23, 2008. Eight days later, however, Cody again made unnecessary changes to the plant, and those changes resulted in nearly losing the plant. Cody wrote in the logbook, "I really screwed up. Don't know how we managed not to loose [sic] the plant. Good help I guess. Would have been a good night. Should have left well enough alone. Totally me at fault." Approximately two weeks later, Schauer again spoke to Cody about his operation of the plant and how he had been making too many unnecessary changes. On November 24, 2008, Cody received his 2008 performance evaluation. Cody scored 1.9 out of 3, indicating that he was not

meeting expectations. Prairie Ethanol's policy provides that any employee who earns less than a 2 on his performance evaluation be placed on a PIP and denied a pay raise. By December, Cody was suffering from a "significant flare in symptoms" as a result of doing medium-duty work. Thus, the doctor recommended another two to three months of light-duty work. Schauer was made aware of this recommendation.

On December 25, Cody once again made changes to the recycle screw, causing the plant machinery to swing. He wrote in the logbook, "This is Brice. Sorry man. All I did is take one point of Recycle off on A[.] And I Had to pay for it all night . . . . Next time if they are Running good I won't touch em." Schauer met with Cody on December 26 to inform him that he was going to be placed on a second PIP. Schauer explained that the PIP was required because Cody scored less than 2 on his 2008 performance evaluation. Cody formally was placed on the second PIP on December 29, 2008, and the written PIP was presented to him on January 7, 2009. However, at the time Cody was placed on the second PIP, Schauer and his immediate supervisors already had decided that they wanted to terminate Cody's employment. Before doing so, however, they needed to obtain approval from Prairie Ethanol's corporate office. Prairie Ethanol's corporate office subsequently approved Cody's discharge, and on January 21, 2009, Prairie Ethanol terminated Cody's employment. The termination document explains that Prairie Ethanol discharged Cody "[b]ecause of Brice's history of concerns and lack of sustained improvement, in addition to the most recent operational incident dated December 25, 2008."

On May 29, 2009, Cody filed a charge of discrimination against Prairie Ethanol with the South Dakota Division of Human Rights. After exhausting his administrative remedies, Cody filed this action, alleging claims of disability discrimination, failure to accommodate, and retaliation under the ADA as well as discrimination under South Dakota law. The district court granted summary judgment in favor of Prairie Ethanol on all of Cody's claims. Cody only appeals the grant of summary judgment with respect to his disability-discrimination claim under the ADA.

## II. Discussion

We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party. *Otto v. City of Victoria*, 685 F.3d 755, 758 (8th Cir. 2012). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The ADA prohibits discrimination in employment "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Cody has not presented any direct evidence to support his claim of discrimination, and therefore we analyze his claim under the *McDonnell Douglas* burden-shifting framework. *See St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012). Under that framework, "plaintiff must first present a prima facie case of intentional discrimination. The burden then shifts to defendant to articulate a legitimate, nondiscriminatory reason for its action. If defendant meets that minimal burden, plaintiff must show that the proffered nondiscriminatory reason is merely a pretext for unlawful . . . discrimination." *Putnam v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003). To establish a prima facie case of disability discrimination, Cody must demonstrate that "(1) he is a disabled person as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability." *St. Martin*, 680 F.3d at 1032.

Assuming, without deciding, that Cody established a prima facie case of disability discrimination, Prairie Ethanol has offered a legitimate, non-discriminatory justification for terminating his employment—Cody's overly aggressive style of operating the plant, which resulted in the plant machinery swinging on three occasions and nearly losing the plant on one of those three occasions. This performance-related

concern constitutes a legitimate, non-discriminatory justification for discharging Cody. *See Chambers v. Travelers Cos.*, 668 F.3d 559, 567 (8th Cir. 2012).

Under the *McDonnell Douglas* framework, the burden shifts back to Cody to show a genuine dispute whether Prairie Ethanol's justification is pretextual. *See St. Martin*, 680 F.3d at 1032. To do so, Cody must show a genuine issue of material fact as to whether Prairie Ethanol actually fired him because of his disability. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999); *see also Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1072 (8th Cir. 1998) (explaining that demonstrating pretext at the summary judgment stage "requires proof that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason"). Importantly, Cody's attempt to prove pretext "requires more substantial evidence" than is required to make a prima facie case because evidence of pretext is viewed in light of Prairie Ethanol's justification. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (quoting *Sprenger v. Fed. Home Loan Bank*, 253 F.3d 1106, 1111 (8th Cir. 2001)); *see also Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005). Cody has failed to meet his burden to bring forth evidence that raises a genuine dispute whether Prairie Ethanol's proffered justification is pretextual.

Cody first argues that the close temporal proximity between Schauer's learning that Cody would need two to three additional months of light-duty accommodation and Cody's discharge, combined with his claim that Prairie Ethanol's justification lacks any basis in fact, demonstrates pretext. However, Cody has not presented any evidence that Prairie Ethanol's explanation has no basis in fact, and "timing on its own is . . . not sufficient to show that an employer's non-discriminatory . . . reason for [an adverse employment action] is merely pretext." *Logan*, 416 F.3d at 881 (first and third alteration in original) (quoting *Sherman v. Runyon*, 235 F.3d 406, 410 (8th Cir. 2000)). Cody only claims that he had no disciplinary record or performance issues before Prairie Ethanol began to express that it would not be able to accommodate him

with light duty forever. The record shows, however, that Schauer spoke to Cody about his overly aggressive manner of operating the plant in November 2007, well before August 2008, when Cody claims that Pitz told him that Prairie Ethanol would not accommodate him indefinitely and began asking him daily when he would return to full duty. Cody also concedes that his unnecessary changes caused the plant machinery to swing on three occasions and that on one of those occasions he nearly lost the plant, even though he previously had been counseled to be less operationally aggressive. Moreover, in his contemporaneous comments in the logbook, Cody admitted fault for causing the plant machinery to swing in November 2008 and again in December 2008.

Cody next claims that Schauer never intended to follow through on the second PIP but instead planned to discharge Cody regardless of his performance on the PIP. Cody asserts that, because Prairie Ethanol had no intention to allow him to fulfill the PIP, there is a genuine dispute whether Prairie Ethanol's performance-based justification for his discharge is pretextual. While Schauer did not intend to follow through on the PIP if Prairie Ethanol's corporate office approved Cody's discharge, it does not follow that Cody has created a genuine question of fact that Prairie Ethanol's justification for discharging Cody is pretextual. Cody claims that Prairie Ethanol's corporate office required the second PIP because it initially declined to approve his discharge. Schauer recommended discharging Cody due to Cody's performance deficiencies, and it was while Schauer was awaiting corporate approval that he placed Cody on the PIP. There is no evidence in the record that Prairie Ethanol's corporate office initially rejected Schauer's discharge recommendation, and it is undisputed that Schauer implemented this second PIP solely because Prairie Ethanol's company policy required the implementation of a PIP for any employee who received a performance assessment score below 2, as Cody had. Moreover, Schauer testified that he intended to follow through with the PIP if Prairie Ethanol's corporate office did not approve his recommendation that Cody be discharged. Thus, the fact that Schauer did not intend to follow through on the second PIP if Prairie

Ethanol's corporate office approved Cody's discharge does not create a genuine dispute whether Prairie Ethanol's justification is pretextual.

Finally, Cody claims that another employee, who also was supervised by Schauer and who did not have a disability, had similar performance deficiencies and was not discharged. While "[i]nstances of disparate treatment can support a claim of pretext," *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1044 (8th Cir. 2000) (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)), Cody has the burden to prove that he and the other employee were similarly situated in all relevant respects, including that the offenses were of the same or comparable seriousness, *see, e.g.*, *id.*; *Harvey*, 38 F.3d at 972. "At the pretext stage of the *McDonnell Douglas* burden-shifting framework, the test for determining whether employees are similarly situated to a plaintiff is a rigorous one." *Fiero v. CSG Systems, Inc.*, --- F.3d ---, 2014 WL 3511780, *4 (8th Cir. July 17, 2014) (quotation omitted). Cody has failed to meet this burden. Cody relies on the other employee's infractions, including downloading movies onto a company computer, skipping mandatory meetings, and making a coworker cry, as well as the more serious infraction—which occurred years after the other infractions—of experimenting with hazardous chemicals in the workplace. However, Cody has presented no evidence that this employee had aggressively operated the plant, causing it to swing on multiple occasions and almost losing it once, which are very serious occurrences because they cause significant decreases in production. Therefore, the employee was not similarly situated because the offenses were not of the same or comparable seriousness. *See Scroggins*, 221 F.3d at 1044.

Accordingly, Cody has failed to raise a genuine dispute whether Prairie Ethanol discharged him because of his disability rather than because of his performance issues, and thus the district court properly granted summary judgment. *See St. Martin*, 680 F.3d at 1032.

## III. Conclusion

For the aforementioned reasons, we affirm.

_____