# United States Court of Appeals

### For the Eighth Circuit

_____

No. 17-2152

_____

Sheena Lipp

*Plaintiff - Appellant*

v.

Cargill Meat Solutions Corporation

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: June 12, 2018
Filed: December 19, 2018

_____

Before LOKEN, ERICKSON, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Sheena Lipp sued her former employer, Cargill Meat Solutions Corporation ("Cargill"), for disability discrimination under the Americans with Disabilities Act ("ADA") and the Iowa Civil Rights Act ("ICRA"). Lipp appeals the district court's[1]

---

[1]The Honorable Stephanie M. Rose, United States District Judge for the Southern District of Iowa.

grant of summary judgment in favor of Cargill. For the reasons discussed below, we affirm.

## I. BACKGROUND

From 1995 until her termination in 2014, Lipp worked for Cargill's meat and processing facility in Ottumwa, Iowa.[2] Throughout her employment, Lipp's job duties involved stacking and supplying empty boxes to the production line, labeling boxes, and sometimes manually moving pallets and packed boxes.

In 2000 Lipp was diagnosed with an incurable lung disease known as eosinophilic granuloma. This disease makes it difficult for Lipp to walk, run, or otherwise exert herself physically, especially during "flare ups." Beginning in October 2012, Lipp's lung disease required several work restrictions. Specifically, she needed to attend three to four out-of-town doctor's appointments per year. She also needed days off during her flare ups, which would occur two to four times per year and last two to four days per occurrence. Lipp also needed to work no more than eight hours a day, five days a week, in a clean working environment free from dust or dirt, with lifting assistance whenever she was required to move pallets. Lipp agrees that Cargill accommodated all of these needs—at least until she was terminated in November 2014.

Central to this case is Cargill's work attendance policy and its application to Lipp as well as its interaction with the ADA. Cargill maintains a written attendance policy with progressive disciplinary action for unplanned absences. The policy states that "[p]unctuality and regular attendance is crucial for efficient plant operations,

---

[2]We portray the facts of this case in the light most favorable to Lipp, the nonmoving party appealing Cargill's successful motion for summary judgment. *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 750 (8th Cir. 2016).

safety, and moral[e]." Employees must report their absences daily using Cargill's automated call-in system at least a half-hour before the start of their shifts, unless they are on approved extended leave. The call-in system prompts employees to press buttons on their phones corresponding to the reason for their absences, including illness, injury, personal business (including vacation), and leave of absence. Under the policy, an employee is charged one "occurrence" point for each "unplanned" absence (as distinct from "planned" absences such as vacation, jury duty, or family and medical leave).

An employee may accrue up to six occurrence points in a calendar year without disciplinary action. An employee's seventh and eighth points each result in written warnings, and the ninth point results in termination. Violations and written warnings remain effective for one year after the date they occur and freeze an employee's point total across calendar years until the disciplinary period expires. An employee may take up to five single days of vacation in addition to the six occurrence absences in a year, but no vacation days are allowed after accruing seven occurrence points.

Cargill's attendance policy provides that employees "*may* be required to verify any absences from work." (Emphasis added.) It also states that all verification "*must* be presented upon the first day the employee returns to work," and "[a]ll medical verification *must* be brought to the nursing department." (Emphasis added.) The policy additionally states that a doctor's note can reduce, but not eliminate, the number of occurrence points accrued for unplanned sick days.

On January 19, 2014, Lipp began what turned out to be roughly a nine-month, unplanned leave of absence unrelated to her medical condition, in order to care for her elderly mother, who had significant health issues. During the first six months of her absence, Lipp provided Cargill with three successive notes from her mother's doctor explaining her absence and predicting how long she would need to care for her mother, including a first note on January 30 (saying she would be needed through

-3-

February 19), another on February 20 (saying she would be needed through March 21), and another on August 25 (saying she would return to regular work duty on October 15). Lipp called in to work every day to report her absences and continued to pay for her health insurance. By April of 2014 she had exhausted her twelve weeks of available leave under the FMLA.

Upon Lipp's return to work on October 15, Cargill provided her with a series of written notifications and warnings informing her of multiple attendance violations dating back to the previous year, explaining that as of October 15, 2014, Lipp had accumulated 194 occurrence points and was being "place[d] on Last Chance for attendance." The note further provided that "Employee needs to understand that any call ins, lates[,] leave early without authorization will violate the last chance agreement and will terminate her employment."

Lipp refused to sign any of the notifications and warnings, including the "last chance" notice. She asked a human resources representative, "what about if I have to take off for my breathing or my lungs or [go] to a doctor appointment?" She was told she needed "to get permission from [her] foreman." Within a week after returning to work Lipp attended a doctor's appointment for her lung disease with Cargill's permission. She verified the appointment with a doctor's note and did not receive an occurrence point. However, Lipp also asked her supervisor about the possibility of missing work because of a breathing flare-up and was told "it didn't matter," that "[o]ne day missed with non-approval was termination."[3]

Shortly thereafter, on October 30, Lipp used Cargill's automated call-in system to report being absent. Lipp believes she reported being "sick" because of a breathing

_____

[3]The district court found that because the "last chance" notice prohibited only "unauthorized" absences, it *allowed* disability-related absences given that Cargill had authorized such absences in the past and allowed Lipp to attend a medical appointment even after she returned from her nine-month leave.

flare-up. Cargill says Lipp reported being absent for "vacation." Lipp acknowledges "it is possible" she keyed in the wrong buttons on Cargill's automated call-in system.[4]

When Lipp returned to work after this absence, she did not provide medical verification of her absence to the nursing department, as required by Cargill's attendance policy verification provision. On November 4, Cargill issued Lipp termination paperwork at a meeting that included a human resources representative, a union representative, and her supervisor. The paperwork stated that Lipp was being fired for "[v]iolation of the Company Attendance policy" and that she had accumulated a 195th occurrence point without sufficient documentation, in violation of the "last chance" notice. Lipp was informed at the meeting that she received her 195th point because she called in for "vacation" on October 30.

Lipp maintains that during the meeting, she quickly explained she had been absent because of a breathing flare up and not vacation. Cargill responds that it gave Lipp an opportunity to submit medical verification, but that she failed to do so. Lipp did eventually submit two doctor's notes, but not until well after her termination. Lipp submitted one note on November 24, 2014 simply restating her general work restrictions. Months later, on February 3, 2015, she submitted another note explaining that she contacted her doctor's office on October 30, 2014 about increasing breathing difficulties and that arrangements were made for testing and follow-up visits.

Lipp was not reinstated following the second note, and she timely filed an action alleging intentional discrimination and failure to accommodate under ICRA and the ADA. After the completion of discovery, Cargill moved for summary

_____

[4]Lipp points to the deposition testimony of one of Cargill's Fed. R. Civ. P. 30(b)(6) corporate representatives indicating that sometimes Cargill employees mistakenly keyed in the reason for their absence on the automated system, and that they were allowed to correct the record when they returned to work.

judgment, arguing that "(1) Lipp cannot show she could perform the essential functions of her job; (2) she did not suffer an adverse action because of her disability; and (3) Cargill had a legitimate, nondiscriminatory reason for terminating Lipp's employment." The district court "agree[d] with Cargill's latter two arguments," ruling that Lipp could not establish that the reason for her termination related to her lung disease rather than to excessive absenteeism. The district court also ruled that Lipp's "tardy explanation" for the reason for her October 30 absence was at best a request for reinstatement rather than a timely request for accommodation as required under the ADA and ICRA. Lipp now appeals, maintaining her claims for both intentional discrimination and failure to accommodate.

## II. DISCUSSION

We review the district court's grant of summary judgment de novo. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1134 (8th Cir. 1999) (en banc). We may affirm the district court on any ground supported by the record. *Wages v. Stuart Mgmt. Corp.*, 798 F.3d 675, 679 (8th Cir. 2015).

Summary judgment is appropriate if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the moving party identifies portions of the record "which it believes demonstrate the absence of a genuine issue of material fact," *see Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), the nonmovant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

With this standard in mind, we must determine whether Lipp suffered discrimination or was denied accommodation under the provisions of the ADA, 42 U.S.C. §§ 12101 *et seq.*, or ICRA, Iowa Code §§ 216.1 *et seq.*[5]

**A.**

The ADA prohibits covered employers from discriminating against a "qualified individual" on the basis of disability. 42 U.S.C. § 12112(a). A "qualified individual" is a person "who, with or without reasonable accommodation, can perform the essential functions" of his or her job. 42 U.S.C. § 12111(8). Under the ADA, prohibited discrimination includes discrimination against a qualified individual because of his or her disability (*i.e.*, intentional discrimination), *see* 42 U.S.C. § 12112(a)–(b)(1), as shown by evidence of disparate treatment or other proof that will vary according to the specific facts of the case. *Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1022 (8th Cir. 1998). Prohibited discrimination also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so "would impose an undue hardship on the operation of the" employer's business. 42 U.S.C. § 12112(b)(5).

This court has "long recognized" that a party may prove intentional discrimination under the ADA either by direct or indirect evidence. *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). "Direct evidence includes 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude,' where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Schierhoff v. GlaxoSmithKline Consumer*

---

[5]"ADA and ICRA disability discrimination claims are analyzed in the same fashion." *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 940 (8th Cir. 2018) (en banc).

*Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993)).

Lipp argues she presents direct evidence of disability discrimination. We disagree. Lipp's argument turns on her position that she reported being "sick" on October 30 and was fired for that reason. However, Cargill presented deposition testimony from two corporate representatives, as well as two sworn declarations based on personal knowledge from Cargill human resources employees, all stating that Lipp reported being absent for "vacation" that day. Lipp responds not with specific facts showing otherwise, but only with an acknowledgment that "it is possible" she unintentionally keyed in the wrong buttons on Cargill's automated call-in system. Therefore, Lipp has not presented direct evidence of discrimination at the summary judgment stage.[6]

In the absence of direct evidence, we next address whether there is indirect evidence of disability discrimination. Where a plaintiff must rely on indirect evidence to prove intentional discrimination under the ADA, we apply the burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Schierhoff*, 444 F.3d at 964. Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination by demonstrating "(1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job [with or without

---

[6]Lipp also contends that all of Cargill's evidence tending to establish its belief that Lipp reported being absent for "vacation" on October 30, 2014 is inadmissible hearsay. Lipp's argument fails for two reasons. First, even if Lipp is correct, "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)(2)). Second, she failed to raise this issue before the district court. Her objection in the first instance on appeal is thus foreclosed. *See Dautremont v. Broadlawns Hosp.*, 827 F.2d 291, 294–295 (8th Cir. 1987).

-8-

a reasonable accommodation]; and (3) a causal connection between an adverse employment action and the disability." *Oehmke*, 844 F.3d at 755. If the plaintiff succeeds, "the burden of production then shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse action." *Id*. The burden then returns to the plaintiff to show that the employer's proffered reason was a pretext for discrimination. *Id*.

With this framework as the guide, we turn to Lipp's prima facie case. The parties do not dispute whether Lipp is disabled within the meaning of the ADA. However, the parties do contest whether Lipp was a "qualified individual" protected by the ADA. Ultimately, we conclude she was not a qualified individual. Lipp has not demonstrated that at the time of her termination she could regularly and reliably attend work, an essential function of her employment.

This court has consistently stated that "regular and reliable attendance is a necessary element of most jobs." *Greer v. Emerson Elec. Co.*, 185 F.3d 917, 921 (8th Cir. 1999) (quoting *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998)). The ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). The ADA's implementing regulations further provide that evidence of whether a function is essential includes, among other things, "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job." 29 C.F.R. § 1630.2(n)(3).

Here, Cargill maintained a written attendance policy stating that "regular attendance is crucial" to its operations. It enforced its policy with a system of progressive discipline, culminating in termination after accruing nine "occurrence" points. In addition, all of Lipp's listed job activities in Cargill's written job description, including labeling boxes and moving pallets, required being present on Cargill's premises. Thus, we are convinced that regular and reliable attendance was an essential function of Lipp's job. *See Greer*, 185 F.3d at 922 (concluding the same

where former employee's factory "maintained a policy and progressive discipline practice regarding absenteeism").

Lipp argues that her 194 absences in 2014 were not excessive. She explains that she reported her absences daily, provided notes from her mother's doctor, and was never told (until she returned to work) that her absences were unauthorized. "Simply put," she says, by missing nine months of work to care for her ailing mother, she "did nothing wrong." On the contrary, Lipp's 195 unauthorized absences far exceeded what qualified for termination under Cargill's policy. Moreover, this court has recognized that persistent absences from work can be excessive "even when the absences are with the employer's permission." *Schierhoff*, 444 F.3d at 966; *accord Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 777 (8th Cir. 2001).

In *Schierhoff*, a packaging mechanic missed 172 days of work in less than two years for various medical and personal reasons, including recovery from surgery and other injuries. 444 F.3d at 964. He was eventually fired for absenteeism. *Id.* He brought suit alleging age and disability discrimination, arguing in part that regular attendance was not actually required where his employer never warned him that his absences were excessive. *Id.* at 963–64. We disagreed, holding that the packaging mechanic's numerous absences "amounted to an inability to perform [his] job," *id.* at 966, and noting that the employer's published policy "clearly indicated" that excessive absences were cause for termination. *Id*. at 967.

Here, despite Cargill's written attendance policy providing for terminable action after nine occurrences of unplanned leave, Lipp took *nine months* of unplanned leave for reasons unrelated to her disability. Within two weeks of returning to work, she missed another day without providing medical verification (at least not until several months later) in violation of the "last chance" notice. Lipp's 195 days of unplanned absences for both personal and medical reasons in less than one year far

exceed the mechanic's 172 missed days in two years that we found disqualifying in *Schierhoff*, thus amounting to an inability to perform her job.

**B.**

Lipp also argues Cargill failed to provide her with a reasonable accommodation after she returned to work—i.e., intermittent time off for her breathing flare ups.[7]

Under the ADA, a request[8] for "a medical leave of absence might, *in some circumstances*, be a reasonable accommodation." *Brannon v. Luco Mop Co.*, 521 F.3d 843, 849 (8th Cir. 2008) (emphasis added). An individual requesting an accommodation must "make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job." *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003). But the ADA does not require employers to provide an unlimited absentee policy. *Brannon*, 521 F.3d at 849. Moreover, an employee invoking ADA protection must show she can perform her essential job functions "*at the time of* her termination." *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1048–49 (8th Cir. 1999) (emphasis added). "[A]n employer need not . . . eliminate the essential functions of a job to accommodate a disabled employee." *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 950 (8th Cir. 1999).

---

[7]She notes that her mother entered a nursing home in October 2014, and thus that she no longer needed long-term leave. Lipp's supervisor also acknowledged in deposition testimony that Cargill could have continued to accommodate Lipp's flare-up related absences two to four times per year lasting two to four days per occurrence.

[8]We assume for the sake of argument, but do not decide, that Lipp satisfied her threshold burden of making a sufficient request for accommodation. *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005).

-11-

Here, Lipp's desired accommodation at the time of her termination—i.e., additional flare-up related absences *without* timely medical verification[9] and *almost immediately* following 194 days of unplanned absences—was "not one[] that would enable her to perform the essential function[]" of regular and reliable attendance, but "would *relieve* her of [that] function[]." *Faulkner v. Douglas Cty. Neb.*, 906 F.3d 728, 734 (8th Cir. 2018) (emphasis added). The ADA's protections do not extend that far. *See Pickens*, 264 F.3d at 778 (holding that disabled train conductor's desired accommodation of remaining unavailable for a given time period, and returning to work whenever he chose was "unreasonable as a matter of law"); *Browning*, 178 F.3d at 1048 (holding that ADA did not protect presumptively disabled employee while recovering from surgery but "*prior to* the point in her recovery when she could once again perform the essential functions of her job").

As this court recently stated, "[i]f an employer 'bends over backwards to accommodate a disabled worker . . . it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'" *Faidley*, 889 F.3d at 943 (quoting *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995)). Here, instead of terminating Lipp, as it could have done, Cargill gave Lipp a "Last Chance for attendance" and continued to permit "authorized" disability-related absences *despite* her excessive absenteeism. This did not, however, make additional unverified absences a reasonable

---

[9]Lipp argues that requiring medical verification when she returned to work following her flare-up (five days later) was too burdensome because her doctor was located out of town and she merely needed to stay home, rest, and take her medication. But "an employer has only to provide an accommodation that is reasonable, not an accommodation the employee prefers," *Faidley*, 889 F.3d at 942–43 (internal quotations omitted). While it's not clear if Cargill required Lipp to produce any form of medical verification before her extended unplanned leave, requiring her to do so afterwards—consistent with company policy, and particularly while she was under a "last chance" notice—was not unreasonable. *See Pickens*, 264 F.3d at 776.

accommodation at that time, no matter how many absences (verified or not) Cargill had permitted to that point or was willing to permit in the future. To hold otherwise would be to punish Cargill for giving Lipp another chance instead of terminating her employment before she returned. We do not read the ADA to apply in such a manner.

### III. CONCLUSION

We affirm the district court's grant of summary judgment in favor of Cargill.

_____