# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1902

_____

Jon D. Higgins

*Plaintiff - Appellant*

v.

Union Pacific Railroad Co.

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 16, 2019
Filed: July 24, 2019

_____

Before COLLOTON, MELLOY, and SHEPHERD, Circuit Judges.

_____

MELLOY, Circuit Judge.

Jon Higgins has chronic back pain. He asked his employer, Union Pacific Railroad ("Union Pacific"), to accommodate his back pain by allowing him to take time off "as necessary" and receive "24 hours of rest per shift (between shifts)." Union Pacific denied his request. Higgins then sued Union Pacific for, among other things, disparate treatment and failure to accommodate under the Americans with

Disabilities Act ("ADA").  The district court[1] granted summary judgment in favor of Union Pacific.  We affirm.

## I.  Background

Higgins began working for Union Pacific in 1976 as a Locomotive Engineer. He was based out of North Platte, Nebraska, and typically worked on trains routed from North Platte to Council Bluffs, Iowa.  Higgins's responsibilities included regulating the speed of the trains and ensuring compliance with safety protocols. Between 1989 and 1992, Higgins suffered two spine-related injuries while performing his job responsibilities.  In 1992, Higgins entered into a settlement agreement with Union Pacific in which he released his personal injury claims against Union Pacific in exchange for payment and "the right to lay off whenever his back bother[ed] him."[2]

On March 12, 1992, Dr. Brittan, Higgins's physician at the time, wrote a letter to Union Pacific stating that Higgins was cleared to work "with the only restriction being that he should not go out more often than every 24 hours."  On June 29, 1992, Union Pacific's Assistant Medical Director, Dr. Richard Peters, wrote to Union Pacific's Superintendent, John Holm that "[t]he medical director's office supports the restriction that on occasion Jon Higgins should not go out on a job assignment more

---

[1]The Honorable Laurie Smith Camp, then Chief Judge, United States District Court for the District of Nebraska.

[2]Higgins no longer has a copy of the settlement agreement.  Union Pacific therefore claims that any discussion of the agreement's terms is "speculative."  An email from a Union Pacific manager in 1998, however, indicates that such an agreement existed and one of its terms was that Higgins could lay off whenever his back bothered him.  The email states:  "This individual has been given t[he] right to lay off whenever his back bothers him . . . as part of a settlement to a law suit involving a personal injury."

than once every 24 hours." On April 7, 1993, Union Pacific's new Superintendent, M.E. Ring, wrote a letter to Higgins stating, "[t]his letter serves as an acknowledgment of the agreement between you and former Superintendent[,] . . . John Holm, with regard to allowable lay-offs." Ring further wrote that while "I have no problem with you laying off when medically necessary[,] . . . lost work periods will be monitored for frequency and timing, and in no way exempt you from discipline if abused."

Several years later, on January 25, 1999, Dr. Brittan wrote another letter to Union Pacific confirming that Higgins's work restrictions were still necessary. The letter stated, "Mr. Higgins has a long standing back injury and his restrictions . . . have been permanent up till now. As far as I know, nothing has changed medically that would require those restrictions to be changed . . . ." On October 26, 1999, Union Pacific agreed that Higgins would continue "not [to] be disciplined as the result of him being absent from service."

In 2004, Michael Humpherys started as Union Pacific's Manager of Training and Attendance for the North Platte Service Unit. Her job focused on improving job attendance. According to Union Pacific's Locomotive Engineer Job Description, "[a]ttendance in compliance with the applicable attendance policy is an essential function of [the] position." Union Pacific's Attendance Policy states that Union Pacific employees are expected to work "on a full-time basis," which means "being available to work your assignment . . . whenever it is scheduled to work." While the policy allows employees to lay off for "personal or family issues," documentation "is expected" and employees can be held in violation of the policy "regardless of the explanation offered if [they] are unable to work full time and protect all employment obligations."

One way for Union Pacific to improve attendance was to reduce "lay-offs." Union Pacific's Locomotive Engineers are assigned to "pool turns," which are groups

of engineers that work on predetermined train routes. Each time a train is ready for departure, the Locomotive Engineer scheduled to work receives an automated call asking whether the engineer wants to accept the shift or "lay off." If the engineer decides to lay off, he must provide an explanation. In the event of a lay-off, Union Pacific turns to the "extra board," a group of engineers who fill short-notice vacancies. If none of those engineers can take the shift, the next engineer in the pool turn is called.

To reduce lay-offs, Humpherys collected attendance data to identify poor performers. Higgins, who had a high number of lay-offs due to his chronic back pain, quickly drew Humpherys's attention. In October 2004, Humpherys called Higgins's attendance "[v]ery borderline." In October 2005, Humpherys found that Higgins ranked last in attendance among his pool turn. In 2007, Humpherys noted that Higgins had been listed on five different "snapshots" (monthly attendance reports) as an employee with poor attendance. In 2008, Humpherys sent a letter to Higgins stating that Higgins's "recent level of job protection [was] unsatisfactory and must be improved," and that "further failure . . . w[ould] subject [him] to disciplinary action." Several other Union Pacific Locomotive Engineers received a similar letter. In 2010, 2011, and 2012, Humpherys continued to monitor Higgins's poor attendance and noted that Higgins appeared on several snapshots each year. In both 2012 and 2013, Higgins laid off 24% of the shifts that he was called to work.

Around 2013 or 2014, Union Pacific began experiencing a manpower shortage in North Platte due to increasing business. Consequently, John Alberry, Union Pacific's Director of Road Operations, directed Humpherys to "start holding people accountable" for attendance. In 2013, Humpherys began sending out warning letters to North Platte employees with poor attendance. On April 11, 2013, Humpherys sent Higgins a letter that said Higgins's "attendance may be trending in the wrong direction or may already be placing [him] in violation of Union Pacific's Attendance Policy." Higgins continued to lay off shifts due to his chronic back pain. On April

2, 2014, Humpherys sent Higgins an Attendance Alert and Advisory letter that said Higgins's "attendance [was] not satisfactory." Five other North Platte Service Unit employees received the same letter. Higgins's attendance did not improve—between May 11, 2014, and August 9, 2014, Higgins missed 26% of his scheduled shifts.

On August 14, 2014, Union Pacific sent Higgins a Notice of Investigation letter "in connection with [his] alleged violation of the Union Pacific Railroad . . . Attendance Policy, as a result of [his] alleged failure to protect [his] employment on a full time basis by excessively absenting [him]self." Higgins was directed to attend a hearing at which he could present documentation supporting his need for the lay-offs. Prior to the hearing date, Higgins filed an occupational injury report stating that he had experienced an anxiety attack caused by "stress [and] depression due to harassment" regarding his lay-offs. Union Pacific then requested that Higgins undergo a fitness-for-duty ("FFD") evaluation.

On September 24, 2014, as a part of the FFD evaluation, Union Pacific asked Higgins's physician at the time, Dr. Citta, whether Higgins had any physical limitations. On October 2, 2014, Dr. Citta responded that he "consider[ed] Mr. Higgins['s] back condition the same [then] as it was at the time that he returned to work in 1990." In addition, he recommended that Union Pacific "[c]ontinue providing at least 24 hours off between shifts or trips" and "[c]ontinue allowing him to layoff as needed secondary to his back pain as per the agreement from 1999." After seeing Dr. Citta's recommendations, Higgins told Dr. Citta that he "inadvertently" left out the word "occasionally" in his discussion of the 24 hours off between shifts or trips. Higgins, however, never requested that Dr. Citta correct the error or follow-up with Union Pacific.

On November 20, 2014, Union Pacific's Medical Department determined, based in part on Dr. Citta's letter, that Higgins needed several permanent job

restrictions, including "24 hours of rest per shift (between shifts)." In a phone call with Rhonda Ross, a Union Pacific FFD Nurse, Higgins confirmed that the restrictions were appropriate but requested that they be updated to also "continu[e] allowing him to lay off as needed secondary to his back pain as per agreement from 1999." Higgins's requested change was never made. On December 3, 2014, Union Pacific determined that Higgins's restrictions "interfere[d] with [his] essential job functions" and could not be reasonably accommodated. Specifically, Union Pacific found that 24 hours of rest between every shift, rather than occasional shifts, was not feasible because nearly 90% of Higgins's calls required him to work on less than 24 hours' rest. On December 4, 2014, Union Pacific notified Higgins that his "supervising department ha[d] been unable to identify a reasonable accommodation that [would] permit [him] to safely return to work in [his] assigned position." Higgins has not been permitted to return to work since the end of 2014.

On December 9, 2016, Higgins filed a lawsuit alleging violations of the ADA, the Genetic Information Nondiscrimination Act, and the Family and Medical Leave Act. The district court granted Union Pacific's motion for summary judgment on all of Higgins's claims. Higgins appeals only the grant of summary judgment on his ADA claims for disparate treatment and failure to accommodate.

## II. Standard of Review

This Court reviews a district court's grant of summary judgment de novo. Libel v. Adventure Lands of Am., Inc., 482 F.3d 1028, 1033 (8th Cir. 2007). "Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." Id.

III.  Discussion

Because Higgins's disparate treatment and failure to accommodate claims are based on circumstantial evidence, we consider them under the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Cody v. Prairie Ethanol, LLC</u>, 763 F.3d 992, 996–97 (8th Cir. 2014) (disparate treatment); <u>Kelleher v. Wal-Mart Stores, Inc.</u>, 817 F.3d 624, 631 (8th Cir. 2016) (failure to accommodate).  Under <u>McDonnell Douglas</u>, "[Higgins] must first present a prima facie case of intentional discrimination."  <u>Cody</u>, 763 F.3d at 996 (citation omitted).  To establish a prima facie case of discrimination, Higgins "must demonstrate that '(1) he is a disabled person as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability.'"  <u>Id.</u> (citation omitted).

Here, the district court found that Higgins failed to establish a prima facie case of discrimination.  Specifically, the district court found that job attendance is an essential function of a Union Pacific Locomotive Engineer and that Higgins is unable to perform that essential function with or without a reasonable accommodation.[3] Higgins disputes whether attendance is an essential function of his job and argues, in the alternative, that he could still perform the essential function of job attendance with a reasonable accommodation.

---

[3]The district court did not address whether Higgins is a disabled person as defined by the ADA or whether Higgins suffered an adverse employment action because of his disability.  Neither do we.

## A. Essential Function

We first address Higgins's argument that job attendance is not an essential function of his job. "Essential functions of the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'" Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 786 (8th Cir. 2004) (citation omitted). The following evidence is relevant in determining whether a job duty is an essential function:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs.

Id. (citation omitted). We have "consistently stated that 'regular and reliable attendance is a necessary element of most jobs.'" Lipp v. Cargill Meat Sols. Corp., 911 F.3d 537, 544 (8th Cir. 2018) (citation omitted).

Here, job attendance is an essential function of a Union Pacific Locomotive Engineer. First, Union Pacific's Locomotive Engineer Job Description lists attendance in accordance with Union Pacific's attendance policy as an essential job function. And, Union Pacific's attendance policy requires that employees be "available to work [their] assignment . . . whenever it is scheduled to work." See Buckles v. First Data Res., Inc., 176 F.3d 1098, 1101 (8th Cir. 1999) ("[Employer] considers attendance to be an 'essential function,' as illustrated by the detailed attendance policies and procedures."). The fact that the attendance policy allows for "personal lay-offs" under certain circumstances does not create a material question of fact regarding whether job attendance is an essential function. See Pickens v. Soo

Line R.R. Co., 264 F.3d 773, 777 (8th Cir. 2001) ("Even though the railroad's system of scheduling appears quite flexible, the railroad's policy requires regular, reliable attendance, and Pickens' conductor's job was full-time."); see also Buckles, 176 F.3d at 1101 ("[Employee] . . . disputes that attendance is essential to [his employer] since there are numerous employees and the company accounts for possible absences. We are not persuaded by such a conclusory argument . . . ." (footnote omitted)).

Second, Union Pacific's repeated warnings to Higgins that his poor attendance was unacceptable further indicate that Union Pacific considered job attendance to be an essential function of its Locomotive Engineers. See Maziarka v. Mills Fleet Farm, Inc., 245 F.3d 675, 681 (8th Cir. 2001) ("[T]he seriousness with which [employer] treated [employee's] absences (e.g., numerous warnings, meetings, and discussions), indicate[d] that dependability and attendance are essential . . . ."), partly superseded by statute as recognized in Brown v. City of Jacksonville, 711 F.3d 883, 889 & n.8 (8th Cir. 2013). The fact that Union Pacific previously accommodated Higgins's back pain by allowing him to miss a large percentage of his shifts also does not create a material question of fact regarding whether job attendance is an essential function. See Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 966 (8th Cir. 2006) ("[A]n employee who cannot attend work cannot perform the essential functions of his job. This is true even when the absences are with the employer's permission.").

Higgins's best counter to the above analysis is that his 1992 settlement agreement with Union Pacific, which allows him to lay off as necessary, supersedes Union Pacific's attendance policy for its Locomotive Engineers, at least as applied to him. But that agreement is best characterized as an agreement to accommodate Higgins's chronic back pain rather than an admission that job attendance is not an

essential function.[4]  Indeed, "[a]n employer does not concede that a job function is 'non-essential' simply by voluntarily assuming the limited burden associated with a temporary accommodation, nor thereby acknowledge that the burden associated with a permanent accommodation would not be unduly onerous." Rehrs v. Iams Co., 486 F.3d 353, 358 (8th Cir. 2007) (alteration in original) (citation omitted).  While Union Pacific's accommodation of Higgins's back pain may not have been temporary, Rehrs still counsels that it does not alter our essential function analysis in this case.

## B.  Reasonable Accommodation

Because job attendance is an essential function of a Union Pacific Locomotive Engineer and Higgins is unable to perform that function *without* a reasonable accommodation, we next address Higgins's argument that he could perform the essential function of job attendance *with* a reasonable accommodation.  "An individual requesting an accommodation must 'make a facial showing that reasonable accommodation is possible and that the accommodation will allow [him] to perform the essential functions of the job.'" Lipp, 911 F.3d at 546 (citation omitted).  An accommodation is not reasonable if it requires an employer to "reallocate or eliminate the essential functions of a job." Faulkner v. Douglas Cty. Neb., 906 F.3d 728, 733 (8th Cir. 2018) (citation omitted).

---

[4]As UP's Superintendent wrote to Higgins in 1993 regarding the agreement: "I have no problem with you laying off when medically necessary. . . . [However,] these lost work periods will be monitored for frequency and timing, and in no way exempt you from discipline if abused."

Here, Higgins's newly requested accommodation—"laying off as necessary" and receiving "24 hours of rest per shift (between shifts)"[5]—is unreasonable. First, Higgins's requested accommodation is unreasonable because it would require Union Pacific to reassign other Union Pacific Locomotive Engineers to shifts that they would not have otherwise been scheduled to work. See Knutson v. Schwan's Home Serv., Inc., 711 F.3d 911, 916 (8th Cir. 2013) (noting that an accommodation is unreasonable if it requires an employer to "reassign existing workers to assist [the employee] in his essential duties." (alteration in original) (citation omitted)). Second, and more importantly, Higgins's requested accommodation essentially amounts to an "unlimited absentee policy," which is unreasonable as a matter of law. Lipp, 911 F.3d at 546; see also Pickens, 264 F.3d at 778 (finding employee's request to "work only when he feels like working . . . unreasonable as a matter of law"); Buckles, 176 F.3d at 1101 (finding employee's request for the "[u]nfettered ability to leave work at any time" to be an unreasonable accommodation). The fact that Union Pacific previously accommodated Higgins's back pain by allowing him to miss a large percentage of his shifts does not create a material question of fact regarding the reasonableness of his newly requested accommodation to lay off as necessary and receive 24 hours off between every shift. See Faidley v. United Parcel Serv. of Am., Inc., 889 F.3d 933, 943 (8th Cir. 2018) (en banc) ("If an employer 'bends over backwards to accommodate a disabled worker . . . it must not be punished for its

---

[5]Higgins argues that Union Pacific misunderstood his requested accommodation and that he only wanted 24 hours off between occasional shifts, not all shifts. But when Union Pacific FFD Nurse Rhonda Ross asked Higgins about his requested accommodations, including the 24 hours off between shifts, he never clarified that he actually only wanted 24 hours off between occasional shifts. See Russell v. TG Mo. Corp., 340 F.3d 735, 742 (8th Cir. 2003) (finding that "it was incumbent upon [the employee] to correct [the employer's] assumption" about the employee's requested accommodation).

generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation.'" (citation omitted)).

## IV. Conclusion

For the foregoing reasons, we affirm the judgment of the district court. Job attendance is an essential function of a Union Pacific Locomotive Engineer and Higgins cannot perform that function with or without a reasonable accommodation. He therefore cannot establish a prima facie case of discrimination under the ADA.

_____