# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1087

_____

Tonya C. Huber

*Plaintiff - Appellant*

v.

Westar Foods, Inc.

*Defendant - Appellee*
_____

Appeal from United States District Court
for the District of Nebraska - Omaha
_____

Submitted: December 13, 2023
Filed: July 1, 2024
_____

Before ERICKSON, MELLOY, and STRAS, Circuit Judges.
_____

MELLOY, Circuit Judge.

In December 2019, Tonya Huber experienced a diabetic episode that caused her to miss work. Days later, her employer, Westar Foods, Inc., fired her. Thereafter, Huber brought this action alleging disability discrimination under the Americans with Disabilities Act ("ADA") and Nebraska Fair Employment Practices Act ("NFEPA"), as well as interference with and retaliation for exercising her rights under the Family and Medical Leave Act ("FMLA"). Westar filed a motion for

summary judgment, which the district court granted. Huber appeals. We reverse and remand for further proceedings consistent with this opinion.

I.

On appeal from a grant of summary judgment, we view the facts in the light most favorable to Huber as the nonmoving party and draw all reasonable inferences in her favor. *Lightner v. Catalent CTS (Kansas City), LLC*, 89 F.4th 648, 651 (8th Cir. 2023).

Westar Foods operates a number of Hardee's restaurants in the Midwest, employing more than 200 people. In December 2018, Westar hired Huber as a store manager for a Nebraska Hardee's location. Prior to employment with Westar, Huber had worked in the fast-food industry for fifteen years. Westar hired Huber to work full-time at fifty hours per week. Huber's ten-hour shifts typically began at 5 a.m. and ended at 3 p.m., while Huber's duties included managing restaurant staff, overseeing store operations, and ensuring the store was opened each day.

Soon after Huber started working at Westar, she was diagnosed with diabetes. In March 2019, Huber had to start taking insulin, including at work. Over the course of her employment, Huber's insulin dosage increased. To manage her diabetes, Huber needed a room temperature location where she could store her insulin. The restaurant's kitchen and office ran upwards of ninety degrees, and Huber struggled to find a room temperature place for insulin storage. As such, she asked her district manager at the time, Matt Thayer, for help finding suitable storage, but he responded, "That's a [you] problem, not a [me] problem." After Cindy Kelchen became Huber's district manager in September 2019, Huber renewed her request for help finding a room temperature location for her insulin, and Kelchen advised storing it in the freezer. When Huber pointed out that the freezer was not room temperature, Kelchen responded, "Then I don't know what to tell you."

In addition to insulin storage, Huber also needed to find time during her shift to eat a meal so she could take her insulin. Huber was often too busy to take meal breaks during her shifts, so she sought help from Kelchen. Kelchen responded by telling Huber to get better at time management.

In December 2019, Huber began to feel sick because of her diabetes. When Huber woke up for her shift on the morning of December 20, her blood glucose level was low, and she was experiencing symptoms consistent with hypoglycemia.[1] Indeed, because of her blood glucose level, Huber "felt out of it" and did not know who or where she was. Huber realized she needed to go to work but then forgot and became confused as to what was happening or where she was supposed to be. Eventually, Huber was able to drive herself to a nearby doctor's office where she was given an IV and medications that sedated her.

Throughout the day of her stay at the doctor's office, Huber called her son and her boyfriend, Richard Grondin, on multiple occasions. One call to Grondin lasted 45 minutes. According to Grondin, Huber was groggy and incoherent when he spoke with her. Huber's son recalled that her communication was "all over the place" and difficult to comprehend. Huber does not remember these calls due to the impact of her diabetic episode.

On the day of the diabetic episode, Westar first discovered that Huber had not come into work when a customer notified Kelchen that Hardee's was not open. Kelchen tried calling Huber, who did not answer, so Kelchen called Huber's son, who was listed as her emergency contact. Huber's son told Kelchen that Huber was at the doctor's office, that her "levels were off," and that Huber would call back. Huber did not end up calling Kelchen that day.

---

[1] "Hypoglycemia is an abnormally low concentration of glucose in the blood which may lead to tremulousness, cold sweat, headache, hypothermia, irritability, confusion, hallucinations, bizarre behavior, and ultimately convulsions and coma." *Wood v. Omaha Sch. Dist.*, 985 F.2d 437, 438 n.2 (8th Cir. 1993) (citing Dorland's Illustrated Medical Dictionary 804 (27th ed. 1988)).

The doctor's office kept Huber under its care until it closed for business. When Huber was discharged in the evening, the medical staff would not permit her to drive because of her condition, so she called Grondin for a ride. Because of her state, Huber was unable to convey to Grondin the directions to where she was, "so he had to use an app to locate her." When they eventually arrived at Huber's home, Huber was delirious, disoriented, and ill, so Grondin decided to stay overnight out of concern for her safety.

Huber slept until 7:45 a.m. the next day, December 21. She had been scheduled to work at 5 a.m. that morning, but she was still ill and recovering from the medications administered at the doctor's office the day before. Westar's attendance policy has a "call-in" requirement, which states that if a store manager is going to be late for work or if they are unable to work, they must call their district manager immediately and at least two hours prior to the start of their shift "when possible." Additionally, the attendance policy states that "[t]exting, emailing or leaving a message is not" an acceptable way to notify management of an absence or tardiness. Huber was aware of the call-in policy, so immediately upon awaking, she called Kelchen and emailed her a doctor's note excusing her from work through December 26. On the call, Huber conveyed her experience and the nature of the diabetic episode to Kelchen. Kelchen took notes of the conversation and wrote that Huber was at the doctor's office because "her levels of her diabetic [sic] was off." During the call, Kelchen was yelling at Huber; indeed, her voice was so loud that it woke Grondin, who was asleep in an adjacent room. When Kelchen asked Huber why she did not notify her in accordance with the call-in policy on either December 20 or 21, Huber explained how the diabetic episode made it extremely difficult to call, mentioning to Kelchen that she could do an internet search to understand the symptoms better. Kelchen did not understand or believe that Huber could not have called, especially when she was able to call her boyfriend and son and drive herself to the doctor's office. During the conversation, Kelchen asked Huber five times why she did not make a "simple phone call" to inform Westar about her absence.

Immediately following her call with Huber, Kelchen called Frank Westermajer, Westar's owner and president, to convey her conversation with Huber. It is undisputed that during the call, the decision was made to fire Huber when she returned from sick leave on December 26. The parties disagree as to whether Westermajer was the sole decision-maker, or whether Kelchen was also a decision-maker.

In the days following her diabetic episode, Huber continued to struggle with her health, experiencing fluctuating blood glucose levels that required hourly readings. On December 22, pursuant to her doctor's guidance, Huber emailed Kelchen and Amy Rowe, Westar's HR representative, requesting FMLA paperwork. Huber did not receive a response and followed up on December 23 to request FMLA forms ahead of a follow-up doctor's appointment that day. Rowe did not provide the paperwork but responded that she had the doctor's note excusing Huber from work and therefore needed nothing additional from Huber's doctor.

At the follow-up appointment, the doctor provided Huber with another note requiring her to be out of work through January 2 due to her diabetes. After the doctor's appointment, Huber once again requested FMLA paperwork, but received no response. The next morning, on December 24, Rowe responded, once again not providing paperwork, but instead requesting a meeting that afternoon despite her awareness of Huber's medical leave. Rowe planned to fire Huber at the meeting. Huber, whose condition was not stable, responded by declining the meeting, providing the new doctor's note, and asking once again for the FMLA paperwork.

Because Huber's sick leave was extended, the December 26 meeting did not occur, and Rowe instead sent Huber a termination letter. The letter stated that the reason for the termination was because Huber "failed to follow the Company's notice procedures for [her] absences on December 20, 2019 and on December 21, 2019." The letter noted that Huber was "fully aware" of the company's notice procedures in part because the company had previously disciplined her for not abiding by them. The letter further explained that because Huber was "driving and

in contact with [her] son" on the day of her diabetic episode, she "should have been able to provide notification of [her] absences to the Company . . . or at the very least prior to [her] scheduled shift on Saturday, December 21."

In addition to providing a reason for termination, Westar's letter also addressed Huber's FMLA request, stating that "[b]ased on [her] explanation that [she] drove [herself] to the clinic on December 20th and the circumstances on December 21, 2019," and because she had "failed to provide notice as soon as possible and practical [and] did not request any need for an accommodation until after the unscheduled absences," her absences would not be covered under the FMLA.

Thereafter, Huber brought this lawsuit alleging Westar violated the ADA and NFEPA by discriminating against her on the basis of her diabetes. Huber also alleged that Westar interfered with her rights and retaliated against her in violation of the FMLA. Westar moved for summary judgment on all claims. Huber then filed a partial motion for summary judgment on Westar's affirmative defenses. Subsequently, Huber also moved to strike two affidavits that Westar filed in opposition to her partial motion for summary judgment. The district court granted Westar's motion for summary judgment. Additionally, the district court denied both of Huber's motions without further discussion. Huber now appeals.

II.

The Court "review[s] a grant of summary judgment *de novo*." *Wages v. Stuart Mgmt. Corp.*, 798 F.3d 675, 679 (8th Cir. 2015). "Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *Corkrean v. Drake Univ.*, 55 F.4th 623, 630 (8th Cir. 2022) (citation omitted); Fed. R. Civ. P. 56(a). "A court at this stage 'does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue' but focuses on whether there are genuine disputes of

material fact for trial." *Walz v. Randall*, 2 F.4th 1091, 1099 (8th Cir. 2021) (quoting *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008)).

## III.

We first address Huber's disability discrimination claim. Under the ADA, employers are prohibited from discriminating against qualified individuals on the basis of their disability. *Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 646 (8th Cir. 2022); 42 U.S.C. § 12112(a)–(b).[2] To establish that an employer took an adverse employment action motivated by discriminatory animus, a plaintiff may present "evidence of disparate treatment or other proof that will vary according to the specific facts of the case." *Lipp v. Cargill Meat Solutions Corp.*, 911 F.3d 537, 543 (8th Cir. 2018). Such evidence can be "direct" or "indirect," terms that refer to the causal strength of the evidence, not necessarily whether evidence is circumstantial. *Id.*; *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012). Direct evidence provides a strong causal "link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *St. Martin*, 680 F.3d at 1033 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). "Direct evidence includes 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude,' where it is sufficient to support an inference that discriminatory attitude more likely than not was a

---

[2]"The disability discrimination provision[s] in the NFEPA are patterned after the ADA, and the statutory definitions of 'disability' and 'qualified individual with a disability' contained in the NFEPA are virtually identical to the definitions of the ADA." *Ryan v. Cap. Contractors, Inc.*, 679 F.3d 772, 777 n.3 (8th Cir. 2012) (citation omitted) (discussing Neb. Rev. Stat. Ann. § 48-1102(9) & (10); 42 U.S.C. §§ 12102, 12111(8)). "In construing the NFEPA, Nebraska courts have looked to federal decisions, because the NFEPA is patterned after Title VII and the ADA." *Id. See also, e.g.*, *Haffke v. Signal 88, LLC*, 947 N.W.2d 103, 113–14 (Neb. 2020). As such, our analysis and conclusions for Huber's ADA claims also apply to the NFEPA claims.

motivating factor." *Lipp*, 911 F.3d at 543 (quoting *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006)). Direct evidence often, though not always, comes in the form of blatant statements expressing discriminatory animus.

Indirect evidence, on the other hand, provides a weaker causal connection but may nonetheless establish discrimination. Where a plaintiff puts forth indirect evidence, we apply the *McDonnell Douglas* burden-shifting framework. *St. Martin*, 680 F.3d at 1033. Under the *McDonnell Douglas* framework, the plaintiff must first make a prima facie showing of discrimination by establishing: "(1) that the plaintiff was disabled within the meaning of the ADA; (2) that the plaintiff was qualified to perform the essential functions of the job; and (3) a causal connection between an adverse employment action and the disability." *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755 (8th Cir. 2016). After the plaintiff establishes their prima facie case, the burden then shifts to the employer to put forth "a legitimate, nondiscriminatory reason for the adverse action." *Id.* Finally, if the employer offers such a reason, the burden shifts back to the plaintiff, who must establish pretext, i.e., "that a [prohibited] reason more likely motivated the employer.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (citation omitted) (alteration in original). Although the burden of production shifts, the burden of persuasion always remains with the plaintiff. *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 740 (8th Cir. 2017).

The district court found that Huber did not present direct evidence, and we agree. Huber has offered no evidence with the causal strength to dispositively show disability discrimination; therefore, we apply the *McDonnell Douglas* burden-shifting framework. The burden for establishing a plaintiff's prima facie case is not onerous, and the district court assumed without determining that Huber met her prima facie burden. *Id.* The employer's burden is likewise not onerous, and the district court found that Westar offered a legitimate, nondiscriminatory reason for terminating Huber's employment. *Torgerson*, 643 F.3d at 1047. Finally, the district court found that Huber failed to show Westar's reason for firing her was pretextual.

Huber disputes the district court's conclusions. Specifically, Huber argues that genuine issues of fact exist as to whether Westar's reason for firing Huber was pretextual. When considering whether an employer's reason for firing is pretext, "the ultimate question is whether the plaintiff presents evidence of 'conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff].'" *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc) (alterations in original) (quoting *Feltmann v. Sieben*, 108 F.3d 970, 975 (8th Cir. 1997)). There are at least two ways a plaintiff may show a question of fact exists regarding pretext: a plaintiff may present evidence that (A) "the employer's explanation is unworthy of credence . . . because it has no basis in fact" or (B) "a prohibited reason more likely motivated the employer." *Gardner v. Wal-Mart Stores, Inc.*, 2 F.4th 745, 748 (8th Cir. 2021) (alteration in original) (citations omitted).

A.

Huber first argues that Westar's reason for terminating her is "unworthy of credence" and "has no basis in fact." *Id.* Westar maintains that it terminated Huber because she violated the company call-in policy on December 20 and 21. Violation of company policies is a legitimate, nondiscriminatory reason for employment termination. *See, e.g.*, *Miner v. Bi-State Dev. Agency*, 943 F.2d 912, 913–14 (8th Cir. 1991). Huber disputes that she violated company policy on the days she was experiencing a diabetic episode. In rejecting Huber's argument, the district court concluded that even assuming Huber did not violate the call-in policy, Westar presented evidence that it had a "good-faith belief that she violated the call-in policy on both occasions."

In reaching its decision, the district court cited *Pulczinski*, where we held that "[t]aken alone, that the employer's belief turns out to be wrong is not enough to prove discrimination." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012). Indeed, typically the "rule in discrimination cases is that if an

employer honestly believes that an employee is terminated for misconduct, but it turns out later that the employer was mistaken about whether the employee violated a workplace rule, the employer cannot be liable for discrimination." *Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008); *see also Pulczinski*, 691 F.3d at 1002. Therefore, "[i]f the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity." *Richey*, 540 F.3d at 784. "The relevant inquiry is whether the [employer] *believed* [the employee] was guilty of the conduct justifying discharge." *Id.* (quoting *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000)) (alterations in original).

In *Pulczinski*, an employer had a genuine belief that the discharged employee had engaged in impermissible activity—specifically, activity that would slow down work. 691 F.3d at 1002. This activity was wholly unrelated to the employee's disability. *Id.* Following an unexcused absence, which the employee argued resulted from his disability, the employer, not believing the employee, conducted a formal investigation into the absence. *Id.* at 1001. During the investigation, the employer learned that the employee had planned to miss work that day to go gambling, encouraged his colleagues to come with him to the casino or to also skip work, and actively discouraged his colleagues from working overtime. *Id.* Based on uncontroverted evidence, the employer terminated the employee not for missing work, which the plaintiff maintained was due to his disability, but rather for "attempting to cause a slowdown in work by discouraging others from working overtime." *Id.* The plaintiff sued.

On an appeal from a motion for summary judgment, the *Pulczinski* employee argued that the district court's decision should be reversed because there was "a genuine issue of fact about whether he truly discouraged overtime work," which the plaintiff argued showed pretext. *Id.* at 1003. We held that even if the employer erred in coming to its conclusion that the plaintiff had sought to cause a work slowdown, the reasoning, like the justification for termination, was unrelated to the plaintiff's disability. *Id.* at 1003–04. *See also, e.g., Johnson v. Securitas Sec. Servs. USA, Inc.*,

769 F.3d 605, 612 (8th Cir. 2014) (applying good faith principle to age discrimination claim); *Liles v. C.S. McCrossan, Inc.*, 851 F.3d 810, 821–22 (8th Cir. 2017) (applying good faith principle to claim of sex discrimination); *Main v. Ozark Health, Inc.*, 959 F.3d 319, 324–26 (8th Cir. 2020) (same).

Notwithstanding the principle articulated in *Pulczinski*, an employer's argument of good faith will not always preclude a discrimination case from reaching a jury. Where an employer seeks to assert a good faith argument, the underlying "reasons for firing must be 'sufficiently independent from'" the protected status or activity. *Gilooly v. Missouri Dep't of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir. 2005) (quoting *Womack v. Munson*, 619 F.2d 1292, 1297 (8th Cir. 1980)); *Richey*, 540 F.3d at 785. Thus, if the reason for an employer's adverse employment action is "so inextricably related to" the disability, "they cannot be considered independently of one another." *Womack*, 619 F.2d at 1297. Indeed, we recently explained that where "a disability caused missed work, and missed work caused termination, it [is not] much of a stretch to conclude that . . . [the] disability caused [the] termination." *Weatherly v. Ford Motor Co.*, 994 F.3d 940, 946 (8th Cir. 2021).[3]

---

[3]We have explained that where, as here, the disability may have caused the conduct and the conduct caused the termination, "accommodation and termination claims are two sides of the same coin." *Weatherly*, 994 F.3d at 946; *see also Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001) ("Often [accommodation and discrimination] claims, are, from a practical standpoint, the same. For the consequence of the failure to accommodate is . . . frequently an unlawful termination. . . . For purposes of the ADA . . . conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination. The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." (citations omitted)). Indeed, employers have a duty under the ADA to reasonably accommodate an employee's *known* disability. *See Kowitz v. Trinity Health*, 839 F.3d 742, 748 (8th Cir. 2016); *Ehlers v. Univ. of Minn.*, 34 F.4th 655, 661 (8th Cir. 2022) (explaining that an employer may violate the ADA where it fails to "make a good faith effort to assist the employee in seeking accommodation" and "the employee could have been reasonably accommodated but for the employer's lack of good faith").

Huber's case is distinguishable from *Pulczinski*[4] because a reasonable jury could conclude her diabetic episode was not independent from her firing. *Gilooly*, 421 F.3d at 740. Here, Huber was fired because she failed to call in to work on days she was experiencing a diabetic episode. As such, Huber argues that her disability precluded her from calling in. Kelchen, on the other hand, did not believe Huber and assumed she was able to abide by the call-in policy on the days of her diabetic episode. Westar's decision to terminate Huber was based on this assumption. Although Westar argues that its termination decision was underscored by Huber's failure to follow the call-in policy on two prior occasions, a factfinder could determine this evidence weighs in favor of Huber. Indeed, a factfinder may conclude that Westar's decision not to terminate Huber on two prior occasions, where her failure to call in was unrelated to her disability, only bolsters Huber's pretext argument.

In these situations, whether the employee's disability caused the conduct that violated company policy and whether the employer acted in good faith are both questions of fact. *See Townsend v. Bayer Corp.*, 774 F.3d 446, 461 (8th Cir. 2014). Therefore, we cannot say as a matter of law that Huber was capable of calling in during her diabetic episode on December 20 and 21, and a jury must decide whether Westar's termination decision was made in good faith or supports a showing of pretext.

---

[4]The dissent also cites two cases that are similar to *Pulczinski* and thus distinguishable from the facts here. In *McNary v. Schreiber Foods, Inc.*, the plaintiff asserted that he had not actually violated company policy when he was caught sleeping at work—the plaintiff never argued that his disability caused him to sleep. 535 F.3d 765, 768–70 (8th Cir. 2008). *Bharadwaj v. Mid Dakota Clinic* likewise is distinguishable, but there, in addition to the plaintiff never asserting that his disability was the cause of the conduct that led to his termination, it was questionable whether the plaintiff even had a disability. 954 F.3d 1130, 1134 n.2 (8th Cir. 2020). Here, no one disputes that Huber missed work because of her diabetic episode, and, as a result, a genuine issue of fact exists as to whether she was able to abide by the call-in policy.

B.

Huber also argues that "a prohibited reason more likely motivated" Westar's termination decision as evidenced by the actions of her two district supervisors, Kelchen and Thayer. *Gardner*, 2 F.4th at 748. The district court determined that Kelchen and Thayer were not decision-makers, and therefore did not consider their actions as evidence of pretext. Because the issue of who qualifies as a decision-maker is critical to whether Huber presented evidence of pretext sufficient to survive a motion for summary judgment, we address that first.

1.

Where an employer "attempt[s] to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." *Vance v. Ball State Univ.*, 570 U.S. 421, 447 (2013). "Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." *Id.* Thus, "[e]ven if an employer concentrates all decisionmaking authority in a few individuals, it likely will not isolate itself from . . . liability." *Id.* at 446–47. Moreover, one need not be a "decision-maker" for an employer to face liability: "Evidence of discriminatory animus among individuals with influence over decisionmaking can be sufficient for a reasonable jury to conclude discrimination was a motivating factor." *Gruttemeyer*, 31 F.4th at 648; *see also Kiel*, 169 F.3d at 1135 (explaining that a factfinder will consider evidence of discriminatory animus by "persons involved" in the adverse employment action).

Huber argues that Kelchen and Thayer were decision-makers or had influence over the decision-making process, and therefore their actions should be considered for evidence of discriminatory animus. The district court concluded that only Westar's CEO, Westermajer, was a decision-maker, and therefore did not consider

Kelchen and Thayer's actions as evidence of discriminatory animus. But it is undisputed that Kelchen and Thayer were Huber's direct supervisors, and as such, Huber went to them when she requested accommodations for her diabetes. A factfinder could interpret their responses to Huber's accommodation requests as exercising delegated decision-making authority.

Moreover, Kelchen called Westermajer immediately after her call with Huber to convey the conversation about Huber's missed absence. During that call, Westermajer made the termination decision. A reasonable factfinder could determine that, at the very least, Kelchen wielded decision-making influence over Westermajer's termination decision. Accordingly, we conclude that Huber has presented sufficient evidence to raise a genuine issue as to whether Kelchen and Thayer were decision-makers or influenced the decision-making process.

2.

Because a factfinder could determine that Kelchen and Thayer were decision-makers or influenced the decision-making process, we consider whether their actions show that "a prohibited reason," i.e., discriminatory animus, more likely motivated Westar's termination decision. A plaintiff may raise a question of fact as to pretext by showing "'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding . . . that an illegitimate criterion actually motivated' the adverse employment action." *Othman v. City of Country Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012) (quoting *Torgerson*, 643 F.3d at 1044).

To support her pretext argument, Huber first asserts that Kelchen's comments and conduct show discriminatory animus. Comments "uttered by individuals closely involved in employment decisions may" provide evidence of discriminatory animus. *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991). Moreover, where conduct and actions indicate contempt toward an employee's disability, we have found a question of fact exists regarding discriminatory animus. *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 833–34 (8th Cir. 2000), *abrogated on other grounds by*

-14-

*Torgerson*, 643 F.3d 1031 (2011). Huber alleges that Kelchen displayed contempt and anger toward her when explaining her absence from work on account of her diabetic episode. Huber alleges that Kelchen was angry over the phone, which is corroborated by Grondin, who stated that he was awoken by Kelchen "screaming" through the phone at Huber and observed that Kelchen was not "very receptive" to what Huber was explaining. A factfinder could infer discriminatory animus from Kelchen's actions and words.

Second, Huber asserts that the close temporal proximity between Kelchen's angry call and Westar's termination decision is further evidence of discriminatory animus. Indeed, close temporal proximity between an employer's discovery of the disability and the adverse employment action can contribute to an inference of discrimination, though on its own this is typically not sufficient to establish pretext. *See Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 833 (8th Cir. 2002). We have clarified that an interval of two months is likely not enough, but "a matter of weeks" could contribute to a finding of discrimination. *See Sprenger*, 253 F.3d at 1113–14; *see also Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002); *Allen Health Sys., Inc.*, 302 F.3d at 833–34. On the other hand, "a 'mere coincidence of timing' can rarely be sufficient." *Kipp*, 280 F.3d at 897 (citation omitted). Here, according to Kelchen's notes, she learned of Huber's disability and the nature of her diabetic episode during their phone call. Immediately after ending the call, Kelchen spoke with Westermajer, during which time the decision was made to terminate Huber. On its face, this timing does not appear coincidental; rather, the timing of the call to Westermajer is strong evidence of pretext.

Huber also argues that Westar demonstrated discriminatory animus when it failed to help her with accommodations. We have held that "[f]ailing to provide an employee with reasonable accommodations can tend to prove that the employer also acted adversely against the employee because of the individual's disability." *Kells*, 210 F.3d at 834. As noted above, Huber presented evidence that Kelchen and Thayer were ambivalent toward Huber's insulin storage and meal break requests. Huber also

provides evidence of Kelchen and Rowe's shared contempt toward accommodating her sick leave after the diabetic episode. Moreover, Kelchen not only yelled at Huber over the phone on December 21, Kelchen equivocated on whether she expected Huber to find coverage for her shifts despite her sick leave. Kelchen stated that Huber was expected to find coverage for her shifts while on medical leave, then backtracked and explained that employees with doctor's notes are not expected to find coverage during leave. Kelchen's expectation that Huber work while sick is further suggested in Kelchen's disciplinary notes from December 23, where she wrote that Huber provided "[n]o communication to [Westar] for her store responsibilities and coverage." Moreover, on December 24, Rowe and Kelchen requested a meeting with Huber even though they were aware of Huber's doctor's note excusing her from work through December 26. Reviewing the facts in the light most favorable to Huber, a reasonable factfinder could interpret Westar as showing contempt toward Huber's disability accommodations.

For its part, Westar denies having ever known about Huber's diabetes until *after* the company had already decided to terminate her employment on December 21. Yet Westar's own records contradict this assertion. Both Kelchen's notes and the termination letter from Rowe suggest that the company knew about Huber's diabetes at least as early as Kelchen's call with Huber's son, who conveyed that Huber's "levels were low." Although "levels were low" did not explicitly say glucose or diabetes, a trier of fact could find that Westar knew nonetheless, especially since those exact words were used in the termination letter Westar sent Huber. Regardless, Westar's company notes confirm that immediately prior to Kelchen's call with Westermajer, Kelchen had learned from talking with Huber that the reason she missed work on December 20 and 21 was due to her diabetes. The fact that Westar was aware of Huber's disability yet continues to deny awareness is strong evidence of pretext. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (holding that a "trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose"); *see also Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1086 (8th Cir. 2013) (same).

In sum, viewed in the light most favorable to Huber, genuine issues of fact exist regarding whether Westar's termination decision was motivated by discriminatory animus and therefore whether its reason for firing Huber was pretext.[5]

IV.

We next turn to Huber's FMLA claims. The FMLA requires employers to provide 12 weeks of unpaid leave to employees who experience "a serious health condition that makes the employee unable to perform the functions of the employee's job." 29 U.S.C. § 2612(a)(1)(D); 29 C.F.R. § 825.112; *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002). Under the FMLA, an employee must notify their employer that they plan to take leave, while an employer is prohibited from "discriminating against employees for asserting rights under the Act." *Darby*, 287

---

[5]In concluding that "[n]o jury could find Westar liable for disability discrimination on this record," the dissent disregards the Court's standard of review and construes the facts in the light most favorable to Westar, not Huber. For example, the dissent splits hairs over whether a "cooler" or a "freezer" was involved, choosing to focus on the former even though the record reflects that both words were used, and, regardless, neither a cooler nor a freezer would have accommodated Huber's insulin storage. The dissent also omits the critical fact that Westar claims it was unaware of Huber's disability until after its termination decision. This is despite the fact that Kelchen's notes, taken immediately before the termination decision was made, reflect the company's awareness of Huber's diabetes. *Reeves*, 530 U.S. at 147 (explaining that an employer's false explanation may indicate pretext).

Courts are not free to disregard standards of review. In fact, here we "are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted) (alteration in original). Standards of review serve as procedural safeguards to place reasonable constraints on courts and insure we do not exceed our authority. These safeguards are especially important on an appeal from a grant of summary judgment where a plaintiff's Seventh Amendment right to a jury trial is implicated. *Harris v. Interstate Brands Corp.*, 348 F.3d 761, 762 (8th Cir. 2003).

F.3d at 679; 29 U.S.C. §§ 2612(e)(2), 2615(a)(2). Huber asserts two types of FMLA discrimination claims: interference and retaliation. 29 U.S.C. § 2615(a)(1)–(2). Huber argues that genuine issues of fact exist as to both her interference and retaliation claims against Westar. An interference claim "alleges that an employer denied or interfered with his substantive rights under the FMLA," while a retaliation claim "alleges that the employer discriminated against him for exercising his FMLA rights." *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C. § 2615(a)(1)–(2)). We address each of Huber's FMLA claims in turn.

A.

"An employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercise[] of any right contained in the FMLA." *Stallings*, 447 F.3d at 1050 (8th Cir. 2006) (citing 29 U.S.C. § 2615(a)(1)). "An employer's action that deters an employee from participating in protected activities constitutes an 'interference' or 'restraint' of the employee's exercise of his rights." *Id.* "Interference includes . . . 'manipulation by a covered employer to avoid responsibilities under FMLA.'" *Id.* (quoting 29 C.F.R. § 825.220(b)).

To succeed on an FMLA interference claim, an employee need only show they were "denied substantive rights under the FMLA for a reason connected with [their] FMLA leave." *Id.* Thus, to prevail on an FMLA interference claim the employee must establish (1) they were eligible for FMLA leave, (2) the employer was on notice of the need for FMLA leave, and (3) the employer denied the employee an FMLA benefit. *Smith v. AS Am., Inc.*, 829 F.3d 616, 621 (8th Cir. 2016). On appeal, Westar does not seriously contest that Huber became eligible for FMLA leave when her diabetic episode caused her to miss more than three days of work. *See Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1147–49 (8th Cir. 2001). Rather, the parties dispute whether Westar was on notice of Huber's eligibility for FMLA leave prior to the company's decision to terminate Huber's employment.

"An employee need not invoke the FMLA by name in order to put an employer on notice that the Act may have relevance to the employee's absence from work." *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000). "Under the FMLA, the employer's duties are triggered when the employee provides enough information to put the employer on notice that the employee may be in need of FMLA leave." *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 852 (8th Cir. 2002) (citation omitted). For the employer to be on notice of the need for FMLA leave, they must be aware of a "serious health condition" and not simply that an employee is "sick." *Id.* at 852–53. A serious health condition would not typically include the common cold. *Rankin*, 246 F.3d at 1147. Instead, a serious health condition includes an "illness" or "impairment" that causes "[a] period of incapacity . . . of more than three consecutive calendar days" or "[t]reatment two or more times by a health care provider." *Id.* (citing 29 C.F.R. § 825.114(a)(2)); *see also* 29 U.S.C. § 2611(11)(B).

If a factfinder determines that an employer was on notice of an employee's serious health condition, the inquiry does not end there. First, the employee must have notified the employer as "soon as practicable." *Spangler*, 278 F.3d at 852 (quoting 29 C.F.R. § 825.302(a)). "This ordinarily means at least verbal notification to the employer within one or two business days of when the need for leave becomes known to the employee." *Id.* (citation omitted) (alterations omitted). Moreover, there must be a causal connection between the termination and the employee's need for FMLA leave. *Stallings*, 447 F.3d at 1050–51.

Huber argues that she put Westar on notice of her need for FMLA leave at least as early as her December 21 call with Kelchen. Westar, on the other hand, asserts that Huber first notified them of her need for FMLA leave when she emailed her request for FMLA paperwork on December 22, after the decision to fire her had been made. As such, Westar argues that Huber failed to provide notification "as soon as practicable." Additionally, Westar argues that even if Huber had notified Westar as soon as practicable, Huber still could not establish FMLA interference because Westar terminated her "for reasons wholly unrelated" to her FMLA needs.

-19-

To resolve this issue, we find *Clinkscale v. St. Therese of New Hope* controls. 701 F.3d 825 (8th Cir. 2012). There, the employee was a nurse with undiagnosed situational anxiety disorder. *Id.* at 826. While at work one day, the employee had a panic attack. *Id.* During the attack, the employee spoke to her employer's HR department who instructed her to go home. *Id.* The next day, the employee met with her personal physician regarding the panic attack, after which, she was given a doctor's note requiring her to take sick leave. *Id.* The employee promptly provided the doctor's note to her HR department, who in turn provided FMLA forms for her physician to complete. *Id.* Later that day, the employer called and fired her on grounds of patient abandonment. *Id.* at 827. The employee sued alleging FMLA interference. The employer contended that it had not interfered with the employee's FMLA rights, because the termination occurred before she put the employer on notice. *Id.* at 828. Furthermore, the employer argued that the employee was "terminated for reasons 'wholly unrelated to the FMLA.'" *Id.* at 827. The district court granted summary judgment to the employer.

In reversing the district court, we first considered whether the employee had put her employer on notice when she spoke with HR during her panic attack or when she provided her employer with a doctor's note and received FMLA paperwork. *Id.* at 827–28. We determined that whether the employer was on notice prior to its termination decision was a material question of fact for the jury. *Id.* Additionally, we held that the panic attack was the cause of the alleged patient abandonment and the reason for her need for FMLA leave. *Id.* at 828–29. We explained: "Given the evidence suggesting a causal connection between [the employee's] condition and her 'patient abandonment,' the district court erred in concluding as a matter of law that [the] 'refusal to work . . . [was] not related to a medical diagnosis of anxiety.'" *Id.* at 829.

Similarly, we conclude that genuine issues of fact exist here. We cannot determine as a matter of law: (1) whether Westar was on notice of Huber's need for FMLA leave prior to its decision to terminate her; (2) whether Huber notified Westar

as soon as practicable; and (3) whether there is a causal connection between Huber's diabetic episode and her failure to abide by Westar's call-in policy. Indeed, viewing the facts in the light most favorable to Huber, a reasonable jury could determine that Westar was on notice of Huber's FMLA needs as early as Kelchen's call with Huber's son. This conclusion is buttressed by the fact that Huber had previously brought her disability to the attention of both Kelchen and Thayer when she requested accommodations related to her diabetes. Likewise, a jury could determine that Huber's call to Kelchen on the morning of December 21 was the soonest she could practically notify Westar. If Westar was on notice, Rowe's refusal to provide Huber with FMLA paperwork on multiple occasions, along with Westar's termination of Huber, could constitute FMLA interference. Accordingly, we find that genuine issues of fact remain as to Huber's FMLA interference claim.

B.

Huber also asserts an FMLA retaliation claim. "The difference between [interference and retaliation] claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." *Stallings*, 447 F.3d at 1051. "Basing an adverse employment action on an employee's use of leave, or in other words, retaliation for exercise of Leave Act rights, is therefore actionable." *Allen Health Sys., Inc.*, 302 F.3d at 832. Where a plaintiff asserts an FMLA retaliation claim, absent direct evidence, we use the same *McDonnell Douglas* burden-shifting framework as ADA discrimination claims. *Hudson v. Tyson Fresh Meats, Inc.*, 787 F.3d 861, 866 (8th Cir. 2015). A plaintiff must show: (1) they "engaged in protected conduct"; (2) they "suffered a materially adverse employment action"; and (3) "the materially adverse action was causally linked to the protected conduct." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011). A "materially adverse action" is one that "deter[s] a reasonable employee from making a charge of employment discrimination." *Id.* (citation omitted). Termination from employment is a materially adverse action. *Id.* If a plaintiff establishes their prima facie case, the burden of production shifts to the employer to "articulate a legitimate,

nondiscriminatory reason for its action," after which the burden shifts back to the plaintiff to show the employer's reason is pretextual. *Id.*

Regarding the first element of a plaintiff's prima facie case, an employee must provide their employer with notice as soon as practicable that they may need FMLA leave. *Id.* at 1000. Thus, here, as with Huber's interference claim, a genuine issue of fact exists regarding whether she provided notice to Westar of her need for FMLA leave and, if so, whether she provided Westar with notice as soon as practicable.

Regarding Huber's burden of showing both a causal connection between her FMLA rights and Westar's termination decision, as well as pretext, we are faced with issues of fact similar to Huber's ADA discrimination claim. For example, the very close temporal proximity between Huber's exercise of her FMLA rights and Westar's adverse employment action may support a finding of causation or pretext. *See Allen Health Sys., Inc.*, 302 F.3d at 833 (finding two weeks between protected FMLA activity and adverse employment action were "extremely close in time" and therefore raised an issue of fact on retaliation). Moreover, because Westar's reason for terminating Huber may be causally connected to her need for FMLA leave, a genuine issue of fact remains. *See Wierman*, 638 F.3d at 1000 (finding that, on an FMLA retaliation claim, an employer's reason for terminating pregnant employee— because she "was tardy or absent from work for pregnancy-related reasons"—was intertwined with the employee's disability); *see also Clinkscale*, 701 F.3d at 828; *Caldwell v. Holland of Texas, Inc.*, 208 F.3d 671, 677 (8th Cir. 2000). Accordingly, we also find that genuine issues of fact remain for Huber's FMLA retaliation claim.

V.

For the foregoing reasons, we reverse and remand the district court's grant of summary judgment to Westar on Huber's ADA, NFEPA, and FMLA claims.[6]

---

[6]Huber also appeals the district court's denial of her motion to strike and motion for partial summary judgment. The district court did not discuss these

STRAS, Circuit Judge, concurring in part and dissenting in part.

The court takes a wrong turn in this case. Westar Foods, Inc., fired Tonya Huber after she violated the company's attendance policy for the third time in less than a year. No matter, the court says, a reasonable jury could find that the termination was "on the basis of" her diabetes, rather than her misconduct. 42 U.S.C. § 12112(a). Like the district court, I would come out the other way. No jury could find Westar liable for disability discrimination on this record.

I.

Everyone agrees on the basic facts. One morning when Huber was set to open the Hardee's location she managed on Westar's behalf, she had a diabetic episode that required medical attention. She made a few calls throughout the day, but none to Westar. Nor did she ask her boyfriend or son to call, so no one knew she was missing from work. Instead, Westar found out when a customer called to complain that the restaurant had not yet opened. And then the next day, she did not report her absence until it was too late, nearly three hours after the start of her shift.

She violated company policy both days. Employees must "call the management person in charge" two hours ahead of time, "when possible," if they will "be late" or not "able to work." Huber had violated this policy before, once within days of starting, when she abandoned her shift without notifying a supervisor. Then, several months later, she received a written warning for "fail[ing] to call and notify her supervisor . . . that she was leaving her shift." In fact, according to the form, she had missed her previous shift too, also without providing sufficient notice.

The warning also notified her that "any further violations" could "lead to further disciplinary action, up to and including termination." It did little good

---

motions in its order granting summary judgment to Westar. Accordingly, to the extent the district court denied these motions, we vacate.

-23-

because, just two months later, she once again failed to notify a supervisor about consecutive absences. At that point, Westar decided to terminate her.

## II.

Despite the multiple violations, the court holds that a reasonable jury could conclude that the reason was her diabetes. 42 U.S.C. § 12112(a) (prohibiting discrimination "on the basis of disability"). That is, her diabetes "actually motivated" the decision to fire her, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (citation omitted), not her repeated violations of the company's attendance policy. *See Lindeman v. Saint Luke's Hosp. of Kan. City*, 899 F.3d 603, 606 (8th Cir. 2018); *see also Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 995 (8th Cir. 2011) (explaining that "violations of company policy" constitute a "legitimate, nondiscriminatory reason[] for termination"). In my view, neither conclusion is reasonable.

Start with the fact that Westar has consistently pointed to the attendance-policy violations as the "actual[] motivat[ion]" for its decision. *Raytheon Co.*, 540 U.S. at 52 (citation omitted). When Huber finally called on that second morning, Cindy Kelchen, her supervisor, asked "why didn't you call?" And the termination letter, sent only a few days later, explained that Huber had "failed to follow the [c]ompany's notice procedures for [her] absences." Westar has never wavered from this explanation, even in its briefing. *See Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) (explaining that if an employer "honestly believed the nondiscriminatory reason [it] gave for the action, pretext does not exist" (citation omitted)).

Westar's actions matched its words. Each time there was a violation, it acted. *See Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012) (emphasizing that the termination occurred "only after" the employee had accumulated prior "written warnings"). The first time Huber abandoned her shift, the company gave her an "Employee Coaching Tool" that stressed the importance of communicating

-24-

schedule changes in advance. And the second time, it went a step further and warned Huber that another violation could result in termination. When she violated the attendance policy for the third time, the company followed through and terminated her. Each time, Westar made clear that the progressive disciplinary steps were for lack of communication, not because she had been sick. *See Raytheon Co.*, 540 U.S. at 52.

Nondiscriminatory explanations for an employment decision are given credence, absent a showing of pretext. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A]n employer [is] entitled to judgment as a matter of law if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision."). Pretext is usually established by showing that the "employer (1) failed to follow its own policies, (2) treated similarly[ ]situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Winters v. Deere & Co.*, 63 F.4th 685, 690 (8th Cir. 2023) (citation omitted). None of these things happened here.

Instead, Huber relies on two types of evidence that plaintiffs typically use to establish their prima facie case, not pretext. *Cf. Reeves*, 530 U.S. at 143 (noting that evidence can be relevant to both). The first is temporal proximity: the close timing between her diabetic episode and the decision to terminate her.[7] *See Gibson v. Geithner*, 776 F.3d 536, 541 (8th Cir. 2015) ("Proximity alone can be enough to establish causation for a *prima facie* case."). The other is alleged supervisor hostility to her past medical requests. *See Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 833–34 (8th Cir. 2000) (noting that the plaintiff had "presented *prima facie*

---

[7]The court's analysis is hard to square. At one point it says that Kelchen "learn[ing] of Huber's disability" shortly before the termination decision "is strong evidence of pretext." *Ante* at 15. Yet at another, it relies on her supervisors' "ambivalen[ce] toward [her] insulin[-]storage and meal[-]break requests," which occurred months earlier, as evidence of Westar's "discriminatory animus." *Id.* Kelchen cannot have first learned of the disability when Westar fired Huber because, by the court's own account, she knew months earlier.

*evidence* of [his employer's] repeated denials of requests for reasonable accommodations" (emphasis added)), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1059 (8th Cir. 2011) (en banc). Under our cases, however, neither is enough to get past summary judgment.

First up is temporal proximity. We have long held that "timing on its own is . . . *not* sufficient to show that an employer's non-discriminatory . . . reason . . . is merely pretext." *Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 997 (8th Cir. 2014) (first and second alterations in original) (emphasis added) (citation omitted). Indeed, if anything, the timing here weakens, rather than supports, Huber's case. *See Wierman*, 638 F.3d at 1001 (observing that "temporal proximity[] is undermined" when an alleged discriminatory "motive coincides temporally with the" nondiscriminatory one). After all, her diabetic episode coincided with yet another violation of Westar's attendance policy—a recurrent problem that the company had taken seriously from the start. *See Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) ("Evidence that the employer had been concerned about a problem before . . . undercuts the significance of the temporal proximity.").

There are similar problems with Huber's hostility-to-diabetes evidence. Recall that Kelchen had responded to Huber's question about having time to eat during her shift with an insensitive comment about improving her time management. And then she later proposed storing her insulin in a cooler, which was not the room-temperature solution Huber was seeking.[8] These comments, to the extent they show discriminatory bias, are so "vague and remote" in time, having come months earlier, that they do little to "link [the] termination with [her] diabetic condition."

---

[8]According to Huber's own deposition, the only *actual* evidence on the issue, it was a "*cooler*," not a freezer. (Emphasis added.) And Westar's human-resources representative did not try to schedule "a meeting" with Huber "despite her awareness of Huber's medical leave." *Ante* at 5. Rather, she asked whether Huber was "available to speak" with her and Kelchen over the phone, either that afternoon or later in the week. Neither of these interactions shows hostility toward Huber's diabetes, much less discriminatory animus. At most, they show indifference.

*Mathews v. Trilogy Commc'ns, Inc.*, 143 F.3d 1160, 1166 (8th Cir. 1998). The timing, in other words, "dilute[s] any inference of causation," *Brown v. City of Jacksonville*, 711 F.3d 883, 890 (8th Cir. 2013) (citation omitted), or "pretext," *Henderson v. Ford Motor Co.*, 403 F.3d 1026, 1036 (8th Cir. 2005). *See Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1113–14 (8th Cir. 2001) (concluding there was not enough evidence of pretext, even though the employer acted against the employee "a matter of weeks" after learning about his disability).

Timing is less of a problem for Kelchen's comments the morning after the diabetic episode, but they still do not establish discriminatory bias or pretext. Huber's failure to call had led to serious problems the day before: the restaurant opened several hours late, which upset at least one customer. The conversation the next day then focused on why she did not call earlier. To be sure, Kelchen may have acted unprofessionally by yelling, but her emphasis on the "need[] to make that simple phone call" confirms that she was upset about Huber's misconduct, not hostile toward her diabetes. *See Smith*, 302 F.3d at 834.

Finally, the comments of Huber's previous supervisor, Matt Thayer, are largely unhelpful because he played no role in terminating her. *See Arraleh v. County of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006) ("distinguish[ing] between comments . . . uttered by individuals closely involved in employment decisions" and those made "by nondecisionmakers" (citation omitted)). It is true that he rudely told her that the need to store her insulin at work was a "[you] problem, not a [me] problem," but the decision to fire her occurred three months after Kelchen had replaced him. And without "unequivocal[] pro[of]" that Westar "fail[ed] to accommodate" her, *Henderson*, 403 F.3d at 1035, these stray remarks, just like temporal proximity, do not provide enough for a "reasonable jury to infer that [disability] discrimination . . . was the real reason for [her] termination," *Winters*, 63 F.4th at 691. *See Sprenger*, 253 F.3d at 1111 ("Prov[ing] pretext or actual discrimination requires more substantial evidence" than a "prima facie case" because the evidence "is viewed in light of the employer's justification.").

## III.

The court reaches a contrary conclusion by cobbling together a new intertwinement test that, until now, has not existed in the disability-discrimination context. *See ante* at 11 (focusing on whether the "adverse employment action is . . . inextricably related to the disability" (citation omitted)). It will require an employer to show that its asserted justification is "sufficiently independent" of the employee's disability, *id.* (quoting *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir. 2005)), even when an employee has repeatedly "violated a workplace rule" or "engaged in misconduct," *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2008).

The rule lacks a firm footing. The court claims that *Gilooly* established it, but it involved a situation that bears no resemblance to this one. An employee brought a Title VII *retaliation* claim after a Missouri agency fired him for allegedly lying about inappropriate conduct during a *sexual-harassment investigation*. *See Gilooly*, 421 F.3d at 737. To ward off the possibility of retaliation against employees who report this type of misconduct, we concluded that an employer's stated "reasons for firing must be sufficiently independent from the filing of [a Title VII] complaint." *Id.* at 740 (citation omitted). *Gilooly* was all about the unique circumstances that arise when retaliation and sexual harassment intersect, not run-of-the-mill discrimination.

Don't just take my word for it. *Gilooly* recognized the limits of its own holding when it said that it "cannot be true that a plaintiff can file false charges, lie to an investigator, and possibly defame co-employees, without suffering repercussions simply because the investigation was about sexual harassment." *Id.* That is, employers can still discipline employees for misconduct. And, as we later clarified, the holding was "narrow" in the sense that it applied "when an employer's discipline was based *solely* on its disbelief of an employee's harassment complaint, without any independent corroboration." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010) (emphasis added). Here, there is no sexual

harassment, alleged or otherwise. And "independent corroboration" exists based on Huber's prior violations and the undisputed fact that she missed the start of two consecutive shifts without calling. *Id.*

Nor does *Weatherly v. Ford Motor Co.*, 994 F.3d 940 (8th Cir. 2021), support the court's new intertwinement test. *See ante* at 11. By its own account, it was all about whether an administrative charge filed with the Equal Employment Opportunity Commission gave adequate notice of a disability-discrimination claim. *See Weatherly*, 994 F.3d at 946. "[C]onstru[ing] [the] administrative charge[] liberally" and noting that "th[e] issue [was] a close call," we concluded the plaintiff had exhausted his remedies "because an administrative investigation . . . would likely have included a look into whether [the employer] unlawfully discriminated against [him] when it terminated him despite his request for accommodation." *Id.* at 944, 946. To state the obvious, providing adequate notice of a possible claim is a far cry from conclusively establishing a violation. To the extent the court insists otherwise, it is saying something that *Weatherly* does not.

The rule is also inconsistent with the Americans with Disabilities Act itself, which prohibits discrimination "on the basis of disability." 42 U.S.C. § 12112(a). This language is causal, requiring, at a minimum, that the disability be a "motivating factor for [the] termination," if not a but-for cause of it. *Gruttemeyer v. Transit Auth.*, 31 F.4th 638, 648 (8th Cir. 2022); *see Pulczinski*, 691 F.3d at 1002 (noting "doubts about the vitality" of the motivating-factor test).

The court's new test, however, is looser than either of those causal standards. The flip side of "sufficient[] independen[ce]," *ante* at 11, is "some connection." If there is some connection between the disability and the termination, such that there is not "sufficient[] independen[ce]" between the two, then the disability-discrimination claim goes to the jury. *Id.*

This case stands as a stark example. Huber had a diabetic episode, which in turn allegedly limited her ability to call into work before her shift. The inability to

-29-

make the call, in turn, led to a violation of the company's attendance policy. The attendance-policy violation then led to her termination. Notwithstanding the attenuated causal chain, the court still sends the claim to the jury because the "diabetic episode was not independent from her firing." *Ante* at 12. The statute requires more: the termination must have been "on the basis of [her] disability," 42 U.S.C. § 12112(a), not just "not independent" from it, *ante* at 12.

Other courts have recognized as much. The Supreme Court, for example, has expressed skepticism about whether basing an employment decision on "workplace misconduct" would violate the Americans with Disabilities Act just because it was "related to [a] disability." *Raytheon Co.*, 540 U.S. at 54 n.6 (noting that it had "rejected a similar argument in the context of the Age Discrimination in Employment Act"). Since then, other courts have outright rejected the possibility. *See, e.g.*, *Neal v. E. Carolina Univ.*, 53 F.4th 130, 152 (4th Cir. 2022) ("[M]isconduct—even misconduct related to a disability—is not itself a disability and may be grounds for dismissal." (citation omitted)); *McElwee v. County of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("[W]orkplace misconduct is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability."); *see also Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 28–29 (1st Cir. 2002) (rejecting it pre-*Raytheon*); *Newberry v. E. Tex. State Univ.*, 161 F.3d 276, 279–80 (5th Cir. 1998) (same); *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1196 (7th Cir. 1997) (same). And so has the Equal Employment Opportunity Commission. *See* U.S. Equal Emp. Opportunity Comm'n, *The Americans with Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities* § III(B)(9) (2008) ("The ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability.").

Not to mention that, under the court's new rule, some of our cases would now come out differently. One example is *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765 (8th Cir. 2008). There, a company terminated an employee with Graves disease—a thyroid disorder that can cause fatigue—for sleeping on the job. *See id.*

at 766 n.2, 768. Despite the fact that "the reason for [the] employer's adverse employment action [was] . . . inextricably related to [his] disability," *ante* at 11 (citation omitted), we affirmed the grant of summary judgment to the company, *see McNary*, 535 F.3d at 770.

The same happened in *Bharadwaj v. Mid Dakota Clinic*, 954 F.3d 1130 (8th Cir. 2020), which involved a medical clinic that "pushed [a doctor] out" because of the interpersonal difficulties that his "mental impairment" had created. *Id.* at 1134 n.2; 1136. Despite the lack of independence between the disability and alleged misconduct, which was "his inability to get along with others," we allowed the grant of summary judgment to the clinic to stand. *Id.* at 1135.[9]

The intertwinement rule also creates a lose-lose situation for employers: let employee misconduct go or risk drawn-out litigation. Suppose that Huber had been late twenty times without calling, or that she had yelled at a customer. Employers will now have to think twice about imposing discipline if there is any possibility that the misconduct lacked "sufficient[] independen[ce]" from an employee's disability. *Ante* at 11. And if they decide to do so anyway, courts and juries will now sit as "super[ ]personnel department[s] [to] reexamine[] [those] business decisions." *Wilking v. County of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998) (citation omitted).

IV.

The court's new intertwinement rule will make a mess. It is also wrong. As a unanimous Seventh Circuit panel put it over 25 years ago, an "employer who fires a worker because [she] is a diabetic violates the Act; but if [the employer] fires [her] because [s]he is unable to do [the] job, there is no violation, even though the diabetes

---

[9]The court is right that the plaintiffs in *McNary* and *Bharadwaj* did not argue that their employers discriminated against them by terminating them for disability-related conduct. *See ante* at 12 n.4. But one likely explanation is that both plaintiffs knew that the argument would not succeed.

is the cause." *Matthews*, 128 F.3d at 1196. That statement rings as true today as it did then. I respectfully dissent from Parts III and V of the court's opinion.

———————————————